**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BOBBIE MCCLUSKEY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SET FORTH, INC.,<br><br>Defendant. | Case No.: 1:24-cv-12203<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR A JURY TRIAL** |

Plaintiff Bobbie McCluskey ("Plaintiff") brings this Class Action Complaint ("Complaint") against Set Forth, Inc. ("Defendant" or "Forth") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsels' investigation, and upon information and belief as to all other matters, as follows:

## SUMMARY OF ACTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard sensitive information of its clients' customers.

2. Defendant is a company that provides online account administration services to consumers enrolled in debt relief programs.

3. Plaintiff's and Class Members' sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was targeted, compromised, and unlawfully accessed due to the Data Breach.

4. Defendant collected and maintained certain personally identifiable information of Plaintiff and Class Members (defined below), who are (or were) customers at Defendant's clients.

5. The personally identifiable information ("PII") compromised in the Data Breach included Plaintiff's and Class Members' full names, addresses, and Social Security numbers.

6. The PII compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals, who target PII for its value to identity thieves.

7. As a result of the Data Breach, Plaintiff and approximately 1,500,000 Class Members[1] suffered concrete injuries in fact, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) loss of the benefit of the bargain; (v) actual misuse of their compromised data consisting of an increase in spam calls, texts, and/or emails; (vi) actual misuse of Plaintiff's compromised data consisting of a fraudulent Old Glory Bank card application made in her name in or around October 2024; (vii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

8. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect its clients' customers' PII from a foreseeable and preventable cyberattack.

9. Upon information and belief, Defendant was targeted for a cyberattack due to its status as a debt collection company that collects and maintains highly valuable PII on its systems.

[1] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5c00fedb-134a-4436-b778-5df30b84cdab.html.

10. Defendant maintained, used, and shared the PII of its clients' customers in a reckless manner. In particular, the PII was used and transmitted by Defendant in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and the resulting potential for improper disclosure of Plaintiff's and Class Members' PII were known risks to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure its clients' customers' PII from those risks left that sensitive information in a dangerous condition.

11. Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

12. Plaintiff's and Class Members' identities are now at risk due to Defendant's negligent conduct because the PII that Defendant collected from them and maintained on its network has been accessed and acquired by data thieves.

13. Armed with the PII accessed in the Data Breach, data thieves have already engaged in identity theft and fraud and can in the future commit a variety of crimes, including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

14. As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

15. Plaintiff and Class Members may also incur out of pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16. Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

17. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII was accessed during the Data Breach.

18. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members; the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs; and members of the proposed Class, including Plaintiff, are citizens of states different from Defendant.

20. This Court has jurisdiction over Defendant due to its business operations in this District. Defendant's principal place of business is in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## PARTIES

22. Plaintiff Bobbie McCluskey is a resident and citizen of Grover Beach, California. Grover Beach is located in San Luis Obispo County.

23. Defendant Set Forth, Inc., is a corporation with its principal place of business located in Schaumburg, Illinois. Schaumburg is located in Cook County.

## FACTUAL ALLEGATIONS

***Defendant's Business***

24. Defendant is a company that provides online account administration services to consumers enrolled in debt relief programs.

25. Plaintiff and Class Members are current and former customers at Defendant's clients.

26. In the course of their relationship, customers at Defendant's clients, including Plaintiff and Class Members, provided Defendant with at least the following: their names, their addresses, their Social Security numbers, and other sensitive information.

27. Upon information and belief, in the course of collecting PII from customers of its clients, including Plaintiff and Class Members, Defendant promised to provide confidentiality and adequate security for the data it collected from such customers through its applicable privacy policy and through other disclosures made in compliance with statutory privacy requirements.

28. Indeed, Defendant provides on its website: "To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These

measures include computer safeguards and secured files and buildings. We also attempt to limit personal information access to only employees, agents and representatives who need to know."[2]

29. Plaintiff and Class Members, as customers at Defendant's clients, relied on these promises and on this sophisticated business entity to keep their sensitive PII confidential and securely maintained; to use this information for business purposes only; and to make only authorized disclosures of this information. Consumers, in general, demand security to safeguard their PII, especially when their Social Security numbers and other sensitive PII are involved.

***The Data Breach***

30. On or about November 8, 2024, Defendant began sending Plaintiff and other Data Breach victims a Notice of Data Security Incident letter (the "Notice Letter"), informing them that:

> **What Happened?**
>
> In May 2024, Forth identified suspicious activity on the network. We immediately implemented our incident response protocols, took steps to secure the network, and engaged independent computer forensic experts to assist us in conducting an investigation.
>
> Unfortunately, the investigation determined that business documents (such as loan applications, credit reports, and bank statements) that may have contained personal information belonging to you, your spouse, a co-applicant, or a dependent may have been accessed during the incident. While there is no evidence that your specific information was misused, we want to make you aware of this incident out of an abundance of caution.
>
> **What Information Was Involved?**
>
> From our review, it appears that the name, address, and/or social security number of you, your spouse, a co-applicant, or a dependent may have been affected.[3]

---

[2] https://www.setforth.com/privacy-policy/.

[3] Defendant's Notice Letter to Plaintiff, dated November 8, 2024 (attached hereto as Exhibit A). A sample copy of the Notice Letter received by other Data Breach victims is available at: https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5c00fedb-134a-4436-b778-5df30b84cdab.html.

31. Omitted from the Notice Letter were the identity of the cybercriminals who perpetrated the Data Breach; the date(s) of the Data Breach; and any details of the root cause or the vulnerabilities exploited by the Data Breach. To date, these omitted details have not been explained or clarified to Plaintiff or Class Members, who retain vested interests in ensuring that their PII is protected.

32. Defendant's "disclosure" amounts to no real disclosure at all, as it fails to inform Plaintiff and Class Members of critical details about the Data Breach with any degree of specificity. Without these details, Plaintiff's and Class Members' abilities to mitigate the harms resulting from the Data Breach are severely diminished.

33. Despite Defendant's intentional opacity about the root cause of the Data Breach, several facts may be gleaned from the Notice Letter, including: a) that this Data Breach was the work of cybercriminals; b) that the cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from those networks and systems (*i.e.*, they exfiltrated data, or in layperson's terms, "stole" data); and c) that once inside Defendant's networks and systems, the cybercriminals targeted information including Plaintiff's and Class Members' Social Security numbers for download and theft.

34. In the context of notice of data breach letters of this type, Defendant's use of the phrase "may have been affected" is misleading lawyer language. Companies only send notice letters because data breach notification laws require them to, and such letters are only sent to those persons whose personal information Defendant itself reasonably believes was accessed or acquired by an unauthorized individual or entity. Defendant cannot hide behind legalese – by sending a notice of data breach letter to Plaintiff and Class Members, Defendant admits that it itself has a

reasonable belief that Plaintiff's and Class Members' names, Social Security numbers, and other sensitive information were accessed or acquired by an unknown actor (*i.e.*, cybercriminals).

35. Moreover, in its Notice Letter, Defendant failed to specify whether it undertook any efforts to contact the approximate 1,500,000 Class Members whose data was accessed and acquired in the Data Breach to inquire whether any Class Members have suffered misuse of their data; whether Class Members should report misuse of their data to Defendant; and whether Defendant has set up any mechanism for Class Members to report any misuse of their data.

36. Defendant had obligations created by the FTC Act, contract, common law, and industry standards to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

37. Defendant did not use reasonable security procedures and practices appropriate to the sensitive nature of the information they were maintaining for Plaintiff and Class Members, such as encrypting the information or deleting information once it was no longer needed, thereby causing the exposure of PII.

38. The attacker accessed and acquired files containing unencrypted PII of Plaintiff and Class Members. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

39. Plaintiff further believes that her PII and the PII of Class Members were subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

***Data Breaches Are Preventable***

40. Defendant did not use reasonable security procedures and practices appropriate to the sensitive nature of the information they were maintaining for Plaintiff and Class Members, such as encrypting the information or deleting information once it was no longer needed.

41. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

42. As explained by the Federal Bureau of Investigation ("FBI"), "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[4]

43. To prevent and detect cyberattacks and/or ransomware attacks, Defendant could and should have implemented the following measures, as recommended by the FBI:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

---

[4] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[5]

44. To prevent and detect cyberattacks and/or ransomware attacks, Defendant could and should have implemented the following measures, as recommended by the Microsoft Threat Protection Intelligence Team:

- **Secure internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privileged credentials;

- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**
  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

[5] *Id.* at 3-4.

- **Apply principle of least-privilege**
    - Monitor for adversarial activities
    - Hunt for brute force attempts
    - Monitor for cleanup of Event Logs
    - Analyze logon events;
- **Harden infrastructure**
    - Use Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection
    - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[6]

45. Given that Defendant was storing the PII of its clients' current and former customers, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

46. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach in which data thieves acquired and accessed the PII of more than one million individuals, including Plaintiff and Class Members.

***Defendant Acquires, Collects, And Stores Its Clients' Customers' PII***

47. Defendant acquires, collects, and stores a massive amount of PII on its clients' current and former customers.

48. As a condition of obtaining services at Defendant's clients, Defendant requires that customers and other personnel entrust it with highly sensitive personal information.

---

[6] *See* Human-Operated Ransomware Attacks: A Preventable Disaster (Mar. 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

49. By obtaining, collecting, and using Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

50. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted their PII to Defendant absent a promise to safeguard that information.

51. Upon information and belief, in the course of collecting PII from its clients' customers, including Plaintiff and Class Members, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures made in compliance with statutory privacy requirements.

52. Plaintiff and the Class Members relied on Defendant to keep their PII confidential and securely maintained; to use this information for business purposes only; and to make only authorized disclosures of this information.

***Defendant Knew, Or Should Have Known, Of The Risk Because Debt Collection Companies In Possession Of PII Are Particularly Susceptible To Cyber Attacks***

53. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting debt collection companies that collect and store PII, like Defendant, preceding the date of the Data Breach.

54. Data breaches, including those perpetrated against debt collection companies that store PII in their systems, like Defendant, have become widespread.

55. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by more than 2,600 percentage points since 2018, and the estimated number of victims has increased by more than 1,400 percentage points. The 3,205 compromises

in 2023 represent a 78 percentage point increase over the previous year and a 72 percentage point increase over the previous all-time high for compromises in a single year (1,860), set in 2021.

56. In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the PII it collected and maintained would be targeted by cybercriminals.

57. Indeed, cyberattacks like the one experienced by Defendant have become so notorious that the FBI and the U.S. Secret Service have issued a warning to potential targets to make sure they are aware of, and prepared for, a potential attack. As one report explained, they warned that smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[7]

58. Additionally, as companies became more dependent on computer systems to run their businesses,[8] *e.g.*, due to employees working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[9]

---

[7] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection.

[8] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[9] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

59. Defendant knew and understood unprotected or exposed PII in the custody of debt collection companies, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

60. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences of a breach of Defendant's data security system, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of such a breach.

61. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to damages due to any fraudulent use of their PII.

62. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement and/or maintain adequate data security measures to protect the PII of Plaintiff and Class Members.

63. The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and resulting damage to victims may continue for years.

64. As a debt collection company in custody of the PII of its clients' customers, Defendant knew, or should have known, the importance of safeguarding PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences that would occur if its data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of such a breach. Still, Defendant failed to undertake adequate cybersecurity measures to prevent the Data Breach.

***Value Of Personally Identifying Information***

65. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[10] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[11]

66. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[12]

67. For example, Personal Information can be sold at a price ranging from $40 to $200.[13] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[14]

68. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social

[10] 17 C.F.R. § 248.201 (2013).

[11] *Id.*

[12] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[13] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[14] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

Security Number," including (1) "Financial Identity Theft," which includes "false applications for loans, credit cards or bank accounts in your name or withdrawing money from your accounts," and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud, and employment fraud; (2) "Government Identity Theft," which includes tax refund fraud; (3) "Criminal Identity Theft," which involves using someone's stolen Social Security number as a "get out of jail free card"; (4) "Medical Identity Theft"; and (5) "Utility Fraud."

69. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

70. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [15] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[16]

71. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone

[15] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.

[16] *Id.*

> is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[17]

72. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[18] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[19]

73. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

74. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[20]

75. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL

---

[17] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf.

[18] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/.

[19] *See* https://www.investopedia.com/terms/s/ssn.asp.

[20] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.")

76. Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[21]

77. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

[21] *See* https://oag.ca.gov/idtheft/facts/your-ssn.

78. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[22]

79. Among other forms of fraud, identity thieves may use PII to obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police.

80. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, as well as a time lag between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[23]

81. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to damages due to any fraudulent use of their PII.

***Defendant Fails To Comply With FTC Guidelines***

82. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses highlighting the importance of implementing reasonable data security practices.

[22] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[23] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf.

According to the FTC, the need for data security should be factored into all business decision-making.

83. In 2016, the FTC updated its publication, "Protecting Personal Information: A Guide for Business," which established cybersecurity guidelines for businesses. These guidelines note that businesses should protect the personal consumer information they keep; properly dispose of personal information that is no longer needed; encrypt information stored on their computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[24]

84. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[25]

85. The FTC further recommends that companies not maintain PII longer than needed to authorize a transaction; limit access to sensitive data; require complex passwords on their network; use industry-tested methods for security; monitor for suspicious activity on their network; and verify that third-party service providers have implemented reasonable security measures.

86. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating their failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act (the "FTC

[24] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[25] *Id.*

Act"), 15 U.S.C. § 45. The FTC's orders resulting from these actions further clarify the measures that businesses must take to meet their data security obligations.

87. These FTC enforcement actions include actions against debt collection companies, like Defendant.

88. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, a business's unfair act or practice of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

89. Defendant failed to properly implement basic data security practices.

90. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII of its clients' customers or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

91. Upon information and belief, Defendant was at all times fully aware of its obligation to protect the PII of its clients' customers. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

***Defendant Fails To Comply With Industry Standards***

92. As noted above, experts studying cyber security routinely identify debt collection companies in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

93. Several best practices have been identified that, at a minimum, should be implemented by debt collection companies in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

94. Other best cybersecurity practices that are standard for debt collection companies include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

95. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

96. These foregoing frameworks are existing and applicable industry standards for debt collection companies, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***Common Injuries & Damages***

97. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) loss of the benefit of the bargain; (v) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) a continued and increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

***Data Breaches Increase Victims' Risk Of Identity Theft***

98. The unencrypted PII of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

99. Unencrypted PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the PII of Plaintiff and Class Members.

100. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

101. Plaintiff's and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

102. Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[26]

103. Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[27]

104. "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[28] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction,

[26] *See* N.C. Gen. Stat. § 132-1.10(1).

[27] *See* https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers.

[28] *See* https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/.

"[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account."[29]

105. One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[30]

106. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

107. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[29] *See* https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[30] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/.

108. The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiff and the other Class Members.

109. Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

110. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss Of Time To Mitigate Risk Of Identity Theft & Fraud***

111. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

112. Thus, due to the actual and imminent risk of identity theft, Defendant's Notice Letter instructs Plaintiff and Class Members to take various precautionary measures to protect their information, including telling them to "remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity."[31]

113. In addition, Defendant's Notice letter includes multiple pages devoted to "Recommended Steps to Help Protect your Information" that recommend that Plaintiff and Class

[31] Notice Letter. See supra n. 3.

Members undertake activities such as monitoring their accounts, placing security freezes and fraud alerts on their accounts, and contacting consumer credit reporting bureaus.[32]

114. Defendant's extensive suggestion of steps that Plaintiff and Class Members must take in order to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiff and Class Members must undertake in response to the Data Breach. Plaintiff's and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiff and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach and at the direction of Defendant's Notice Letter.

115. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, replacing impacted credit cards, and signing up for credit monitoring insurance services. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

116. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[33]

117. Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud

---

[32] *Id.*

[33] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[34]

118. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

***Diminution of Value of PII***

119. PII is a valuable property right.[35] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

120. Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[36]

121. An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[37]

---

[34] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.

[35] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[36] *See, e.g.,* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[37] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

122. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[38,39]

123. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[40]

124. As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

125. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

126. The fraudulent activity resulting from the Data Breach may not come to light for years.

---

[38] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[39] https://datacoup.com/.

[40] https://digi.me/what-is-digime/.

127. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to damages due to any fraudulent use of their PII.

128. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, which amounted to more than one million individuals' detailed personal information, and, thus, was or should have been aware of the significant number of individuals who would be harmed by the exposure of the unencrypted data.

129. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement and/or maintain adequate data security measures to protect the PII of Plaintiff and Class Members.

***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

130. Given the type of targeted attack in this case, sophisticated criminal activity, and the type of PII involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes, such as opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

131. Such fraud may go undetected until debt collection calls begin months, or even years, later. An individual may not know that their PII was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

132. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

133. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

***Loss Of Benefit Of The Bargain***

134. Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant's clients for products or services that required disclosing their PII, Plaintiff, Class Members, and other reasonable consumers understood and expected that they were, in part, paying for necessary data security to protect their PII. Because Defendant did not, in fact, provide that expected data security, Plaintiff and Class Members received products or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant's clients.

***Plaintiff Bobbie McCluskey's Experience***

135. Upon information and belief, Defendant obtained Plaintiff's PII in the course of conducting its regular business operations.

136. Upon information and belief, Defendant maintained Plaintiff's PII in its system at the time of the Data Breach.

137. Plaintiff is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

138. Plaintiff received the Notice Letter, by U.S. mail, directly from Defendant, dated November 8, 2024. According to the Notice Letter, Plaintiff's PII, including her name, address, and Social Security number, was improperly accessed and obtained by unauthorized third parties.

139. As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff to "remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity[,]"[41] Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, replacing impacted credit cards, and signing up for credit monitoring and insurance services. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

140. Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach, including but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of her PII; (iv) loss of the benefit of the bargain; (v) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (viii) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it

141. Plaintiff also suffered actual injury in the form of a fraudulent Old Glory Bank card application made in her name without her consent or approval in or around October 2024. Upon information and belief, this fraudulent card application was caused by the Data Breach.

142. Plaintiff additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and emails, which, upon information and belief, was caused by the Data Breach. This misuse of Plaintiff's PII was caused, upon information and belief, by the fact that

[41] Notice Letter. See supra n. 3.

cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an affected individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts in order to gain access to their devices with phishing attacks or to elicit the disclosure of further personal information for use in committing identity theft or fraud.

143. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

144. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

145. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

146. Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

147. Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5).

148. The Class that Plaintiff seeks to represent is defined as follows:

> **Nationwide Class**
> All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant in November 2024 (the "Class").

149. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

150. Plaintiff reserves the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

151. Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. According to the breach report submitted to the Office of the Maine Attorney General, at least 1,500,000 Class Members were impacted in the Data Breach.[42] The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

152. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a. Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

b. Whether Defendant had respective duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

---

[42] *See* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5c00fedb-134a-4436-b778-5df30b84cdab.html.

c. Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

e. Whether and when Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendant's wrongful conduct;

k. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

153. Typicality: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

154. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the

Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

155. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intend to prosecute this action vigorously.

156. Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

157. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure

to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

158. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

159. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

160. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

161. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

162. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant failed to timely notify the Plaintiff and the class of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c. Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII; and Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

**<u>COUNT I</u>**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

163. Plaintiff re-alleges and incorporates by reference all preceding factual allegations, as if fully set forth herein.

164. Defendant requires its clients' customers, including Plaintiff and Class Members, to submit non-public PII in the ordinary course of providing its debt collection services.

165. Defendant gathered and stored the PII of Plaintiff and Class Members as part of its business of soliciting its services to its clients, which solicitations and services affect commerce.

166. Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

167. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

168. By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

169. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

170. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the PII.

171. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That

special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of being customers at Defendant's clients.

172. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

173. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

174. Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

175. Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

176. Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

177. Defendant breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Failing to adequately monitor the security of their networks and systems;

c. Allowing unauthorized access to Class Members' PII;

d. Failing to detect in a timely manner that Class Members' PII had been compromised;

e. Failing to remove former customers' PII it was no longer required to retain pursuant to regulations, and

f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

178. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

179. Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statute was intended to guard against.

180. Defendant's violation of Section 5 of the FTC Act constitutes negligence.

181. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

182. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

183. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the debt collection industry.

184. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

185. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems or transmitted through third party systems.

186. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

187. Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

188. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

189. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

190. Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

191. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

192. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

193. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injuries, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) loss of the benefit of the bargain; (v) actual misuse of their compromised data consisting of an increase in spam calls, texts, and/or emails; (vi) actual misuse of Plaintiff's compromised data consisting of a fraudulent Old Glory Bank card application made in her name in or around October 2024; (vii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it

194. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PII,

which remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

195. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

196. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

197. Plaintiff re-alleges and incorporates by reference all preceding factual allegations, as if fully set forth herein.

198. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their PII. In exchange, Plaintiff and Class Members should have had their PII protected with adequate data security.

199. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' PII for business purposes.

200. Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

201. Defendant acquired the PII through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

202. If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would have entrusted their PII at Defendant or obtained services at Defendant's clients.

203. Plaintiff and Class Members have no adequate remedy at law.

204. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PII.

205. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

206. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injuries, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) loss of benefit of the bargain; (v) actual misuse of their compromised data consisting of an increase in spam calls, texts, and/or emails; (vi) actual misuse of Plaintiff's compromised data consisting of a fraudulent Old Glory Bank card application made in her name in or around October 2024; (vii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a)

remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

207. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

208. Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT III**
**Violation Of The Illinois Consumer Fraud Act**
**815 Ill. Comp. Stat. §§ 505/1, *et seq.***
**(On Behalf of Plaintiff and the Class)**

209. Plaintiff re-alleges and incorporates by reference all preceding factual allegations, as if fully set forth herein.

210. Plaintiff and the Class are "consumers" as that term is defined in 815 ILL. COMP. STAT. § 505/1(e).

211. Plaintiff, the Class, and Defendant are "persons" as that term is defined in 815 ILL. COMP. STAT. § 505/1(c).

212. Defendant is engaged in "trade" or "commerce," including the provision of services, as those terms are defined under 815 ILL. COMP. STAT. § 505/1(f).

213. Defendant engages in the "sale" of "merchandise" (including services) as defined by 815 ILL. COMP. STAT. § 505/1(b) and (d).

214. Defendant's acts, practices, and omissions were done in the course of Defendant's business of marketing, offering for sale, and selling debt collection services in the State of Illinois.

215. Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the Illinois CFA) in violation of the Illinois CFA, including, but not limited to, the following:

a. failure to maintain adequate computer systems and data security practices to safeguard current and former customers' PII;

b. failure to disclose the material fact that its computer systems and data security practices were inadequate to safeguard the personal information it was collecting and maintaining from theft;

c. failure to disclose in a timely and accurate manner to Plaintiff and the Class Members the material fact of Defendant's data breach;

d. misrepresenting material facts to Plaintiff and the Class, in connection with the sale of goods and services, by representing that it would maintain adequate data privacy and security practices and procedures to safeguard Plaintiff's and Class members' PII from unauthorized disclosure, release, data breaches, and theft;

e. misrepresenting material facts to the class, in connection with the sale of goods and services, by representing that Defendant did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Plaintiff's and Class members' PII, and

f. failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiff's and Class members' PII from further unauthorized disclosure, release, data breaches, and theft.

216. In addition, Defendant's failure to disclose that its computer systems were not well protected and that Plaintiff's and Class members' sensitive information was vulnerable and susceptible to intrusion and cyberattacks constitutes deceptive and/or unfair acts or practices because Defendant knew such facts would (a) be unknown to and not easily discoverable by Plaintiff and the Class; and (b) defeat Plaintiff's and Class members' ordinary, foreseeable and reasonable expectations concerning the security of their PII on Defendant's servers.

217. Defendant intended that Plaintiff and the Class rely on its deceptive and unfair acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts, in connection with Defendant's offering of goods and services and storing Plaintiff's and Class members' PII on its servers, in violation of the Illinois CFA.

218. Defendant also engaged in unfair acts and practices by failing to maintain the privacy and security of class members' personal information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the data breach.

219. These unfair acts and practices violated duties imposed by laws including Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45) and similar state laws.

220. Defendant's wrongful practices occurred in the course of trade or commerce.

221. Defendant's wrongful practices were and are injurious to the public interest because those practices were part of a generalized course of conduct on the part of Defendant that applied to all Class members and were repeated continuously before and after Defendant obtained PII from Plaintiff and Class members.

222. All Class members have been adversely affected by Defendant conduct and the public was and is at risk as a result thereof.

223. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered harm, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) loss of benefit of the bargain; (v) actual misuse of their compromised data consisting of an increase in spam calls, texts, and/or emails; (vi) actual misuse of Plaintiff's compromised data consisting of a fraudulent Old Glory Bank card application made in her name in or around October 2024; (vii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

224. Pursuant to 815 ILL. COMP. STAT. § 505/10a(a), Plaintiff seeks actual, compensatory, and punitive damages (pursuant to 815 ILL. COMP. STAT. § 505/10a(c)), injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the Illinois CFA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grants the following:

A. For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct

complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi. prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x. requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi. requiring Defendant to conduct regular database scanning and securing checks;

xii. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect herself;

xvii. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii. for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: November 26, 2024

Respectfully Submitted,

By: /s/ *Gary M. Klinger*

Gary M. Klinger (IL Bar No. 6303726)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

James J. Pizzirusso*
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, D.C. 20006
Tel.: (202) 540-7200
jpizzirusso@hausfeld.com

Steven M. Nathan*
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel.: (646) 357-1100
snathan@hausfeld.com

*Counsel for Plaintiff and the Proposed Class*

**Pro Hac Vice Forthcoming*